## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | |
| ATLAS TACK CORPORATION and | ) | |
| M. LEONARD LEWIS, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF MOTION OF THE UNITED STATES FOR AN ORDER IN AID OF IMMEDIATE ACCESS

The United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), by and through the undersigned counsel, submits this Memorandum of Law In Support of its Motion for an Order in Aid of Immediate Access. On this date, the United States simultaneously filed a Complaint seeking an Order in Aid of Immediate Access and for civil penalties, resulting from Defendants' unreasonable failure to comply with an initial request by EPA, and a subsequent administrative order directing compliance with that request ("Access Order"), for access to the Atlas Tack Corporation Superfund Site ("Site"). Pursuant to the accompanying motion to this memorandum, the United States respectfully requests that the Court, at this time, only act on the United States' request for access, so that the limited activities described in EPA's Access Order may promptly proceed. At a later date, following applicable judicial proceedings, the United States will pursue its claim for the imposition of civil penalties.

# I. **INTRODUCTION**

The United States filed this action against the Defendants, Atlas Tack Corporation

("ATC") and M. Leonard Lewis ("Lewis"), under Sections 104(e) of the Comprehensive

Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"),

42 U.S.C. §§ 9604(e)(1) to obtain the Defendants' compliance with EPA's "Administrative

Order Directing Compliance with Request for Access," ("Access Order"), served on the

Defendants on August 18, 2004. By its Access Order, EPA intends to perform specific remedial

activities on property owned by ATC and controlled by Lewis, located at 83 Pleasant Street,

Fairhaven, Massachusetts (the "Property" or "ATC Property"). The Property constitutes

approximately 22 acres of the Atlas Tack Corporation Superfund Site ("Site").

The portion of the Site for which access is sought is the upgradient area of the Site,

known as the Commercial Area, where ATC and its predecessors, for about 85 years, conducted

manufacturing operations, resulting in a release or threat of release of hazardous substances. The

activities described in the Access Order are a subset of the remedial action selected by EPA in its

Record of Decision ("ROD") for the Site, issued on March 10, 2000. EPA first sought access to

conduct activities in the Commercial Area on August 2, 2004, via a letter request ("Request For

Access To Property" or "Letter Request"), authorized by CERCLA section 104(e), 42 U.S.C.

§9604(e). After access was denied under the Letter Request, EPA issued the Access Order on

August 18, 2004; the Order became effective on August 25, 2004.

The United States respectfully requests that the Court grant the relief sought because:

(1) the United States is authorized under Section 104(e) of CERCLA to enter the ATC Property

to conduct the activities described in the Access Order, but it has not been able to obtain access

by consent of the owner of the Property or the person exercising control over the Property; and

(2) any delay in the initiation of the remedial action delays the cleanup of the Property and the

Site, and also may result in the continued release or threat of release of hazardous substances to

the environment. Section 104(e)(5) of CERCLA, 42 U.S.C. § 9604(e)(5), authorizes that an

order in aid of immediate entry and access, as requested by the United States here, may be issued

by the Court on the basis of a specifically prescribed, narrowly limited standard of judicial

review. By its motion and supporting memorandum, the United States seeks to enforce its

clearly established authority under CERCLA for such entry and access. If EPA is granted access

to the Property on or about September 24, 2004, it should be able to complete the remedial

activities described in the Access Order before the onset of winter conditions. Accordingly, the

United States seeks an Order, compelling the Defendants to comply provide access to the ATC

Property to initiate the remedial action.

## II. FACTS

A. Site Description and Facility Operations

In addition to the ATC Property, described above, the Site includes a 3.2-acre parcel,

more or less, of property abutting the southeast side of the ATC Property, owned by Hathaway-

Braley Wharf Company, and other areas where hazardous substances may have migrated,

including a portion of Boys Creek and its tidal marsh. AR 1122 (Doc. No. 32)[1]  A facility

building is located on the Property, and is referred to as the Main Building. AR 1122-1123 (Doc.

---

[1] This brief contains citations to the Administrative Record "AR"), which has been certified
to the Court. The citation includes a Bates page number, including the document number, as
indicated in the Index. The United States is providing, by First Class Mail, a disk containing the
Administrative Record.

No. 32). The Main Building covers approximately three acres of land, and consists of three sections: the front, a two-story office building, which contained the ATC offices; the middle, a one-story portion (much of which has previously been demolished) where most of the manufacturing occurred; and the rear, a three-story portion, where manufacturing activities also occurred. AR 1368 (Doc. No. 33); AR 1127 (Doc. No. 32). A system of trenches, sumps, and pipes undergirds the former middle section of the Main Building (now a concrete slab), the rear section of the Main Building and other areas of the Property. AR 1100 - 1110 (Doc. No. 29); AR 2655 (Doc. No. 38); AR 1369 - 1370 (Doc. No. 33). A so-called plating pit and a pickling trench sits beneath the middle section of the Main Building, as well. AR 1127 (Doc. No.32); AR 1392 - 1393 (Doc. No. 33).

Between 1901 and 1985, ATC and its predecessors manufactured, inter alia, tacks, nails, and shoe eyelets at the Property. AR 1122 (Doc. No. 32); AR 1368 - 1369 (Doc. No. 33). The operations, at times, included electroplating, acid-washing, enameling, parts cleaning and painting. Id. ATC discharged process wastes containing acids, metals such as copper and nickel, cyanide and solvents into drains in the floor of the Main Building. AR 1122 (Doc. No. 32). As a result, hazardous substances permeated the floors and timbers of the Main Building and migrated to adjacent soil and groundwater. Id. ATC discharged wastewater from the facility's operations first to an adjacent marsh and later to an on-site lagoon, through a network of trenches, sumps, and pipes situated underneath certain structures at the Site, particularly the former middle section and rear section of the Main Building. AR 1122 - 1123 (Doc. No. 32); AR 1369 - 1372 (Doc. No. 33); AR 2655 (Doc. No. 39).

On August 13, 1998, the Bristol County Superior Court in the Commonwealth of Massachusetts entered a judgment against ATC in an action brought by the Town of Fairhaven to compel ATC to abate certain fire hazards at the Site. AR 1124 (Doc. No. 32). Pursuant to the 1998 judgment, ATC demolished the one-story, middle portion of the Main Building. Id. A concrete slab that once underlay the one-story middle portion still remains, but in a deteriorated condition. Id.; AR 0979 - 0983 (Doc. No. 18). The rear portion of the Main Building, where ATC conducted some of its manufacturing activities, is dilapidated, and portions of the roof and third floor have collapsed. AR 0039 (Doc. No. 5); AR 0042 - 0043 (Doc. No. 6); AR 0983, 0984, 0988, 0991 - 0995, 0998 - 1005 (Doc. No. 18 ).

B. Previous Actions and EPA's Selected Remedy

In February 1990, EPA listed the Site on EPA's National Priorities List ("NPL"), making it eligible for federal funding for investigation and cleanup. AR 1123 (Doc. No. 32). By agreement executed on July 31, 1990, ATC granted EPA access to perform investigations, remedial design, and emergency response actions at the Site. AR 1078 - 1081 (Doc. No. 25). From 1995 to 1998, EPA completed the Remedial Investigation/Feasibility Study ("RI/FS") - which is an investigation of the nature and extent of contamination at the Site and an evaluation of remedial cleanup alternatives - in accordance with CERCLA and its corresponding National Contingency Plan ("NCP") regulations, 40 C.F.R. Part 300. AR 1343 - 2646 (Doc. Nos. 33-37); AR 3079 - 3850 (Doc. No. 42-45).

Following public comment, during which time ATC submitted comments, on March 10, 2000, EPA issued a Record of Decision ("ROD"), selecting the remedial action for the Site. AR 1114 - 1342 (Doc. No. 32). For remedial purposes, EPA's ROD divides the Site into several

areas: the Commercial Area; various Non-Commercial Areas (Solid Waste and Debris, Marsh, and Creek Bed Areas); and the Groundwater Area. AR 1154 (Doc. No. 32); AR 3097 (Doc. No. 42). In general, the ROD requires: (a) excavation of contaminated soil, sludge and sediment throughout the Site, treatment (where needed), and off-site disposal; (b) monitored natural attenuation of groundwater, enhanced by phytoremediation technology; and (c) land and groundwater use restrictions. AR 1154 - 1166 (Doc. No. 32). As documented in the ROD, EPA selected remediation of the soil and sludge in the Commercial Area of the Site in order to address unacceptable risks to both human health and the environment posed by contaminated soil and sludge. AR 1140 - 1141 (Doc. No. 32). EPA selected remediation of soil and sediment in the Non-Commercial Areas and groundwater in the Groundwater Area in order to address unacceptable risks to the environment caused by the migration of contamination to Boys Creek and the nearby tidal marsh, as well as unacceptable risks to human health for consumers of shellfish from Boys Creek. AR 1140 - 1141 (Doc. No. 32).

EPA is implementing performance of the remedial action in stages. AR 0025 (Doc. No. 2). EPA requires immediate access to the ATC Property to proceed with the remediation of contaminated soil and sludge within the Commercial Area of the Property. The Commercial Area, which is upgradient of other areas of the Site, is where ATC conducted its manufacturing operations and includes the Main Building and areas adjacent to the Main Building. Id.; AR 1127 (Doc. No. 32); AR 1420 -1424 (Doc. No. 33); AR 1788 - 1791 (Doc. No. 35). The Commercial Area covers approximately ten acres. AR 3097 (Doc. No. 42). Contamination from the soil and sludge in the Commercial Area leaches to the groundwater and surface water, and

migrates to the Non-Commercial Areas of the Site. AR 0025 (Doc. No. 2); AR 1127 (Doc. No. 32); AR 1420 - 1424 (Doc. No. 33); AR 1788 - 1791 (Doc. No. 35).

During the RI of the Site, EPA performed soil and sludge sampling in the Commercial Area, including the sampling of currently exposed soil and of sludge found in the trenches and plating pit underneath the concrete slab. AR 1392 - 1394 (Doc. No. 33). Through all of the soil and sludge sampling performed in the Commercial Area, EPA has identified the following hazardous substances in various locations within this area of the Site: metals (including arsenic, beryllium, cadmium, chromium, copper, lead, nickel, and zinc), cyanide, volatile organic compounds (VOCs, primarily toluene), semi-volatile organic compounds (SVOCs, primarily polycyclic aromatic hydrocarbons ("PAHs")), and polycholorinated biphenyls ("PCBs") (Arochlor 1260). AR 0026 (Doc. No. 2); AR 1127 (Doc. No. 32).

As provided in the ROD, EPA has established soil cleanup levels for both the surface and subsurface soil (including sludge) in the Commercial Area to eliminate the unacceptable risk to human health and to the environment. AR 1191 - 1192 (Doc. No. 32). The specific activities that EPA plans to perform within the Commercial Area during the remedial action include: additional sampling to better define the remediation areas; excavation of soil and sludge that exceed the surface and subsurface cleanup levels; and off-site disposal of contaminated soil and sludge at appropriately licensed facilities. AR 1162 - 1163 (Doc. No. 32). In order to complete the planned remedial activities, EPA intends to demolish certain structures in the Commercial Area, including the concrete slab, where EPA found substantial quantities of highly contaminated sludge in the course of its RI, and the dilapidated rear three-story portion of the Main Building. ATC disposed of waste into a system of trenches, sumps and pipes underlying the rear portion of

the Main Building. AR 1162 - 1163 (Doc. No. 32). As a result of these activities, soil underneath this portion of the Main Building (as well as the concrete pad) is likely to be contaminated. AR 0028 (Doc. No. 2).

The Fire Chief and the Building Commissioner of the Town of Fairhaven have determined that it is unsafe to enter the rear portion of the Main Building due to its deteriorated condition. AR 0038 - 0040 (Doc. No.5); AR 0041 -0043 (Doc. No. 6); AR 1082 - 1083 (Doc. No. 26); AR 1084 - AR 1086 (Doc. No. 27); AR 1087 - 1099 (Doc. No. 28). Removal of the existing structure is necessary so that EPA can safely sample the soil underneath the building and, if necessary, remediate this soil through excavation and off-site disposal. AR 0028 (Doc. No. 2); AR 1162 (Doc. No. 32). Finally, EPA will perform sampling of, within, and around the collection system of trenches, sumps and pipes underlying the concrete slab and the rear portion of the Main Building. AR 0028 (Doc. No.2) EPA will also sample the remains of the plating pit and pickling trench below the concrete slab. Id. Based on EPA sampling of some of these structures, and their former use in facility operations, all of these structures are likely to be contaminated. Id. EPA does not plan to raze any other buildings or structures at the Site at this time. Id.

C.    Both ATC and M. Leonard Lewis Will not Agree to Allow EPA Access to the ATC Property

On August 2, 2004, EPA issued its Letter Request to both ATC, as owner and operator of the property, and Lewis in his individual capacity, requesting access to perform remedial activities in the Commercial Area. AR 0073 - 0086 (Doc. No. 8); AR 0087 - 0098) (Doc. No. 9). In the Letter Request, EPA requested access to the Property, requested that Defendants indicate their consent by signing and returning the attached Consent For Access To Property, by August

6, 2004, and apprised the Defendants that any failure to respond to the Letter Request would be considered a denial. Id.

ATC did not respond by August 6, 2004. AR 0031 (Doc. No. 3). Lewis, through his counsel, advised EPA in a letter dated August 6, 2004, that he could not grant or agree to the request for access because "he does not own the property at 83 Pleasant Street." AR 0037 (Doc. No. 4). Neither Defendant made any attempt to confer with EPA regarding EPA's Letter Request. For its part, even after August 6, EPA continued to confer with the Defendants to obtain their consent to access. On August 10, 2004, at a meeting attended by counsel for EPA, ATC, and Lewis, ATC's counsel confirmed that ATC's failure to respond to the Letter Request indicated that it did not consent to EPA's Letter Request.

Accordingly, on August 18, 2004, EPA issued its Access Order, pursuant to 42 U.S.C. § 9604(e)(5). AR 0001 - 0023 (Doc. No. 1). The Order requires the Defendants to grant entry and access to the ATC Property "for the purpose of taking a response action by performing remedial action activities in the Commercial Area of the Site." AR 0005 (Doc. No. 1). It identified specific remedial activities, that would be undertaken, and it explained the basis or need for each. AR 0010 - 0013 (Doc. No. 1). The Access Order further required the Defendants to refrain from interfering with EPA's entry and access to the Site and performance of the selected remedial action. AR 0017 (Doc. No. 1). The Access Order invited Defendants to request, within three business days of its receipt, a conference with EPA to discuss the factual basis for the issuance of the Order. AR 0019 (Doc. No. 1). On August 19, 2004, counsel for ATC and Lewis responded by letter and asked for a telephone conference, which was held on Monday, August 23, 2004. AR 4475 (Doc. No. 268); AR 4476 (Doc. No. 269). During this

conference, the Defendants raised concerns only about the language in the Order reminding and stating that Defendants' unreasonable failure to comply with the Order would expose them to daily civil penalties of up to $32,500, in accordance with applicable law (i.e., 42 U.S.C. 9604(e)(5) and the Civil Monetary Penalty Inflation Adjustment Rule, 69 Fed. Reg. 7121, 40 C.F.R. Pt. 19.4). AR 4470 (Doc. No. 266). The Defendants added that their objections to EPA's selected remedial activities had been previously stated, in their July 20, 2004 "Joint Motion for a Preliminary Injunction," and, therefore, that they had no need to revisit their substantive objections to the Order. Id.; AR 4473 - 4474 (Doc. No. 267); AR 4464 (Doc. No. 265). Since the discussion, the Defendants have given EPA no indication that they have any interest in voluntarily granting access to the Property or, for that matter, in raising specific objections to the limited terms of the Order, requiring access to the ATC Property in order to proceed with the planned remedial action. Accordingly, pursuant to Paragraph 52 of the Order, EPA advised the Defendants, by letter dated August 25, 2004, that the Order's effective date was August 25, 2004. Defendant's have not complied with the Order. AR 4464 (Doc. No. 265).

## III. OVERVIEW OF ACCESS AUTHORITY

CERCLA was enacted to afford the President a broad array of powers to clean up sites where hazardous substances have been released into the environment. Among those powers granted under Sections 104(a) and (b) of CERCLA, 42 U.S.C. § 9604(a) and (b), is the authority to use "Superfund" monies[2] to investigate and clean up such sites and the concomitant authority

---

[2]    The Superfund, formerly the Hazardous Substance Response Trust Fund, was created by CERCLA. Fund monies used to investigate and remedy hazardous waste sites are returned to the Fund through cost recovery from the parties responsible for polluting the sites. See Sections 107 and 122(h) of CERCLA, 42 U.S.C. §§ 9607 and 9622(h).

under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), to enter such sites for those same purposes. Specifically, 42 U.S.C. § 9604(a), provides, in relevant part: "(1) <u>Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, . . . , the President is authorized to act, consistent with the national contingency plan, to . . . provide for remedial action relating to such hazardous substance . . . .</u> Id. Emphasis added.

Section 104(e)(1) authorizes the President or any duly delegated representative[3] to exercise the access authority of Section 104(e) for the broad purposes "of determining the need for response, or choosing or taking any response action under [CERCLA], or otherwise enforcing the provisions of [CERCLA]." 42 U.S.C. § 9604(e)(1). CERCLA defines "response" to mean "remove, removal, remedy, and remedial action[.]" 42 U.S.C. § 9601(25). These terms include "enforcement activities related thereto." Id. Site access is such an enforcement activity and is, itself, therefore a response.

EPA and its representatives are authorized to enter property to conduct response activities when EPA determines that "there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant." 42 U.S.C. § 9604(e)(1). Once EPA determines that grounds exist for entry, its rights to entry and access are far reaching. See B.F. Goodrich Co. v. Murtha, 697 F. Supp. 89, 92 (D. Conn. 1988) (EPA's access authority may be exercised for the purpose of "choosing or taking any response action" authorized under

---

[3]    The President has delegated his authority under CERCLA Section 104 to EPA. Exec. Order No. 12580, sec. 2(g) and (i), 52 Fed. Reg. 2923, 2925 (1987) (delegates investigatory, response, and entry authority with regard to facilities not owned and operated by the federal government).

Section 104).  Section 104(e)(3)(D) authorizes EPA and its representatives to enter "[a]ny vessel, facility, establishment or other place or property where entry is needed to determine the need for response or the appropriate response or to effectuate a response action." 42 U.S.C. § 9604(e)(3)(D).  (Emphasis added.)

Under CERCLA section 104(e)(5)(B) of CERCLA, 42 U.S.C. § 9604(e)(5)(B), where "there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant," the Court shall enjoin any interference with EPA's entry to the property unless EPA's demand for entry is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."  See United States v. Mountaineer Refining Co., 886 F. Supp. 824, 828 (D. Wyo. 1995) (where EPA sought entry to property, "only the EPA's determination that there is a release or threatened release of hazardous substances . . . is subject to review under an arbitrary and capricious standard").  Thus, Congress has limited the court's role in reviewing EPA's determination.  In the circumstances before this Court, once the Court concludes that EPA has a reasonable belief that there has been a release or threat of release of hazardous substances, it need only confirm that EPA has selected a remedial action and that its request for access is a reasonable means of implementing that selection.

It is well settled that judicial review of EPA's selection of response actions for a site must be based on the administrative record developed by EPA in the course of its decision, and must be upheld unless found to be arbitrary and capricious or otherwise not in accordance with law. 42 U.S.C. § 113(j).[4]  Since access, itself, is a response action - as an enforcement action related to

---

[4] A "Notice of Filing of Certified Index to the Administrative Record," with EPA's certified index of the administrative record for the Access Order, is filed simultaneously with the United
(continued...)

the cleanup - the demand for access is to be reviewed on the administrative record. The appropriateness of the cleanup, itself, is not at issue in the access case. When a court is reviewing an agency's scientific determination, the court "must generally be at its most deferential." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 (1989) quoting Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103 (1983)). Indeed, courts accord EPA particular deference when it is acting within its expertise. See Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 125 (1985) (EPA's interpretation of necessary actions to implement the Clean Water Act are entitled to "considerable deference."). Moreover, courts have held that "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378. The reason for this limited standard of review of the EPA's remedy selection is plain. De novo review cannot be reconciled with the complex, technical requirements for the clean-up of hazardous waste sites contained in CERCLA and the NCP. EPA, as an agency designated to implement its statutory mandate, has the expertise and resources to interpret and apply the applicable technical standards to select the appropriate response actions. As one court stated, "[t]his court cannot and will not substitute its layman's judgment for the scientific conclusions made by the EPA after years of in-depth study . . . ." United States v. Ward, 618 F. Supp. 884, 900 (E.D.N.C. 1985).[5]

---

[4](...continued)
States' Complaint and Motion for An Order In Aid of Immediate Access.

[5] The Court in Ward stressed that, in challenging EPA's selection of a remedial action,

(continued...)

Section 104(e)(5)(B)(i) of CERCLA directs the court to enjoin any interference with EPA's entry in accordance with EPA's request unless under the circumstances EPA's demand for access is "arbitrary and capricious." Section 104(e)(5)(B), in conjunction with the Civil Monetary Penalty Inflation Adjustment Rule, 69 Fed. Reg. 7121, 40 C.F.R. Part 19.4, further provides that this Court may assess a penalty not to exceed $32,500 for each day of noncompliance with EPA's request, and . As noted above during a subsequent phase of these proceedings, the United States intends to ask the Court to consider imposing a civil penalty for the Defendants' failure to allow access, so that the initiation of the remediation of the Site, including the ATC Property, is not delayed.

## IV. **DISCUSSION**

THE COURT SHOULD ISSUE THE REQUESTED ORDER IN AID OF IMMEDIATE ACCESS PURSUANT TO SECTION 104(e) OF CERCLA

To obtain court-ordered compliance with its entry request in the instant action, EPA must satisfy four prerequisites. First, the entry sought must be authorized under paragraphs (3) of Section 104(e). 42 U.S.C. § 9604(e)(5)(A). Second, EPA must demonstrate there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance, pollutant or contaminant. 42 U.S.C. § 9604(e)(5)(B). Third, EPA must request consent to entry from an authorized person, e.g., the owner of the property or someone who has the authority to agree to the requested access, with some interference with or denial of the request resulting therefrom. 42 U.S.C. § 9604(e)(5)(A) and (B)(i). Fourth, the demand for entry must not be arbitrary and

---

[5](...continued)

"[d]efendants may only show that the EPA's decision about the method of cleanup was 'inconsistent' with the NCP in that the EPA was arbitrary and capricious in the discharge of their duties under the NCP." Ward, 618 F. Supp. at 900.

capricious, an abuse of discretion, or otherwise not in accordance with law.  42 U.S.C. §

9604(e)(5)(B)(i).  Courts have consistently recognized that EPA's entry authority under Section

104(e) of CERCLA is extremely broad.[6]  As demonstrated below, each of the statutory elements

that EPA needs to satisfy in order to gain entry and access to the ATC Property are satisfied.

   A.    The ATC Property Falls Within The Categories of Properties Which EPA and Its
         Representatives Are Authorized to Enter

       Section 104(e)(3) of CERCLA, 42 U.S.C. § 9604(e)(3), authorizes entry to four

overlapping categories of vessels, facilities, establishments, property, places, or other locations.

A location falling within any one of the categories is within EPA's authority to enter under the

statute.  The Site history, sampling results and previous response activities at the ATC Property

provide strong evidence that it is a facility, property, or place at which a hazardous substance or

pollutant or contaminant has been or may have been released, or may be or has been disposed of,

and is a facility, property, or place where a release is or may be threatened.  See  (Doc. Nos. 33 -

37); Doc. Nos. 42 - 45).  Thus, the request falls within Section 104(e)(3)(A)-(C).  More

importantly,  EPA's need for access to the ATC Property squarely falls within Section

104(e)(3)(D), which provides for entry and access to: "Any . . . facility . . . where entry is needed

_____

   [6] See, e.g., United States v. Fisher, 864 F.2d 434 (7th Cir. 1988) (access granted for site
investigation); New Jersey Dept. of Envtl. Protection v. Briar Lake Dev., 736 F. Supp. 62 (D.N.J.
1990) (state agency entitled to immediate access to property adjacent to landfill for purposes of
completing cleanup of landfill), aff'd, 961 F.2d 210 (3d Cir. 1992); United States v. M. Genzale
Plating, Inc., 723 F. Supp. 877 (E.D.N.Y. 1989) (access granted to EPA in order to conduct
remedial investigation); United States v. Charles George Trucking Co., 682 F. Supp. 1260 (D.
Mass. 1988) (access granted to site and adjacent properties to construct remedy); United States v.
Iron Mountain Mines, Inc., 1987 WL 46792 (E.D. Cal. Sept. 18, 1987) (EPA's right to access to
conduct remedial action); United States v. Dickerson, 660 F. Supp. 227 (M.D. Ga.), aff'd, 834
F.2d 974 (11th Cir. 1987) (access granted to EPA for purposes of investigating, monitoring,
sampling and conducting remedial action at drum storage site).

to determine the need for response or the appropriate response or to effectuate a response action under this subchapter." (Emphasis added.) EPA seeks an order authorizing entry to the ATC Property to perform a selected remedial action and to enjoin Defendants' interference with performance of the remedy.  Clearly, EPA should be permitted entry onto the ATC Property.

B.    EPA Has More Than a Reasonable Basis to Believe That There Has Been A Release or Threatened Release of Hazardous Substances at the ATC Property And Therefore Seeks Access to Effectuate a Remedial Action

Not only does EPA have a reasonable basis to believe that there is or may have been a release or threatened release of hazardous substances into the environment, as required by Section 104(e)(1) of CERCLA, 42 U.S.C. § 9604(e)(1); see also United States v. W.R. Grace & Co., 134 F. Supp.2d 1182, 1188 (D. Mont. 2001) ("'reasonable basis' is an 'undemanding standard'") (citing United States v. Fisher, 864 F.2d 434, 438 (7th Cir. 1988)), but there is documented evidence of a release of hazardous substances at the ATC Property and a need to effectuate a remedial action.  The history of the Site, the 1990 inclusion of the Site on the Superfund's NPL, and EPA's own response activities at the Site, including its RI/FS, provide EPA with a reasonable belief that there is or may have been a release or threat of release of hazardous substances on the ATC Property.  See supra at 4 (description of the hazardous substances noted above).

By this Motion, EPA seeks access to the Commercial Area in order to initiate on-site remedial activities.  As noted above, the specific activities that EPA plans to perform within the Commercial Area during the remedial action include:  additional sampling to better define the remediation areas; excavation of soil and sludge that exceed the surface and subsurface cleanup levels; and off-site disposal of contaminated soil and sludge at appropriately licensed facilities.

Supra at 7-8. In order to complete the planned remedial activities, EPA intends to raze certain structures in the Commercial Area, including the concrete slab, where EPA found substantial quantities of highly contaminated sludge in the course of its RI, and the dilapidated rear three-story portion of the Main Building. Id. ATC disposed of waste into a system of trenches, sumps and pipes underlying the rear portion of the Main Building. Id. As a result of these activities, soil underneath this portion of the Main Building (as well as the concrete pad) is likely to be contaminated.[7] Id.

Thus, EPA reasonably believes that a release of a hazardous substance has or may have occurred. Its request for access and entry for the purpose of effectuating the selected remedial action, including the removal of the concrete slab and the three-story rear portion of the Main Building, clearly is not arbitrary and capricious. 42 U.S.C. §9604(e)(1).

C.     EPA Requested Consent to Access the Site and that Request has been Denied.

As discussed previously on pages 17-18, on August 2, 2004, EPA issued a Request for Access To Property, to both ATC and Lewis, in his individual capacity. EPA's Letter Request asked the Defendants to submit an executed access agreement, which was attached to the Request, to EPA by August 6, 2004. The Letter Request further advised the Defendants that if they failed to do so "EPA will assume that you do not consent to this request for access." The Request also invited the Defendants to contact EPA, to schedule a meeting, if they wished to discuss the request. Defendants did not consent to the requested access. Moreover, neither ATC

---

[7] EPA is implementing the remedial action in a measured way so as not to affect the property needlessly. There are at least several other structures and buildings on the ATC Property that we are not seeking authority to remove, at this time.

or Lewis sought a meeting nor made any other attempt to discuss with EPA its request for access.

On August 18, 2004, EPA issued its Access Order, requiring the Defendants to grant entry and access to the ATC Property, "for the purpose of taking a response action by performing remedial activities in the Commercial Area of the . . . Site." In a telephone conference with counsel for the United States, the Defendants indicated that they would not allow access to the Property for the selected remedial action. However, they made no attempt to discuss the need for access as identified in the Order. The Order became effective on August 25, 2004, and Defendants have failed to indicate their intent to comply with it, as directed in the Order.

D.    The Court Should Immediately Grant EPA's Demand for Entry and Access

Defendants' denial of access is interference with EPA's legitimate request and order for entry and access, and therefore, the Court should enjoin defendants from such interference. Section 104(e)(5)(B)(i) of CERCLA, 42 U.S.C. § 9604(e)(5)(B)(i), provides for mandatory injunctive relief to prohibit interference with the authority afforded by Section 104(e): "In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference . . . ." 42 U.S.C. § 9604(e)(5)(B)(i).[8]

EPA's determination that entry and access is needed should be upheld unless that determination is arbitrary and capricious. 42 U.S.C. § 9604(e)(4)(B). Given the history of the Site and EPA's documentation of actual and/or threatened releases of hazardous substances at or

---

[8] This Court's issuance of an order granting access should follow immediately and automatically from EPA's satisfaction of the statutory prerequisites. EPA does not need to make the traditional showing for injunctive relief because Congress, through Section 104(e) of CERCLA, has supplanted the need to make that showing. See, e.g., Briar Lake, 736 F. Supp. at 65-66; Genzale Plating, 723 F. Supp. at 887.

on the ATC property, particularly in the Commercial Area, EPA's belief that there is a release or threat of a release is reasonable. EPA's determination that entry and access is needed for the expressed purpose of implementing the selected remedial action in the Commercial Area of the Property is clearly neither arbitrary nor capricious.

Defendants' failure to voluntarily agree to access to the Site unnecessarily delays the implementation of the remedial action at the Site. EPA hopes to commence performance of the planned Phase I work so as to complete that work prior to the onset of the winter weather conditions. Defendants should not be allowed to prevent EPA from initiating the remedial action at the Site.

## VI. CONCLUSION

For the foregoing reasons, and as provided in Section 104(e)(5)(B) of CERCLA, the United States respectfully requests that this Court grant this motion and sign the accompanying order, which:

1.    Directs Defendants to provide to EPA, its officers, employees, or representatives with immediate, unimpeded entry and access to the Atlas Tack Property, pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), for the purposes of performing the selected remedial action, pursuant to Sections 104(e)(3) of CERCLA, 42 U.S.C. §§ 9604(e)(3), as set forth by EPA in its Access Order;

2.     Enjoins Defendants, pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e),

from obstructing, impeding or otherwise interfering with entry and access by EPA, its officers,

employees, or representatives, to the Site for the purposes of effectuating the selected remedial

action described in paragraph 1 above.

Respectfully submitted,

THOMAS L. SANSONETTI
Assistant Attorney General

ALFRED S. IRVING, JR.
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C.  20044-7611
(202) 305-8307

MICHAEL J. SULLIVAN
United States Attorney
District of Massachusetts

GEORGE B. HENDERSON, II
Assistant United States Attorney
District of Massachusetts
One Courthouse Way
Suite 9200
Boston, Massachusetts 02110
(617) 748 - 3272

OF COUNSEL:

MAN CHAK NG
Senior Enforcement Counsel
Office of Environmental Stewardship
U.S. Environmental Protection Agency
One Congress Street, Suite 1100, Mail Code SES
Boston, MA 02114-2023