IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 04-11-880-WGY |
| v. ) | |
| ) | |
| ATLAS TACK CORPORATON and ) | |
| M. LEONARD LEWIS, ) | |
| ) | |
| Defendants. ) | |

**ATLAS TACK CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION
OF THE UNITED STATES' MOTION FOR AN ORDER IN AID OF
IMMEDIATE ACCESS**

## I.   Introduction

The United States' Motion for an Order in Aid of Immediate Access filed on August 27, 2004 offers this Court a selected version of events that distorts and obscures the fundamental issues and facts. The stark reality is that there is no immediate threat to human health or welfare at this site which would justify the demolition of these buildings or the expenditure of these funds.

Moreover, the Government would have this Court believe that the issue of access first arose with the issuance of the Government's demand letter on August 2, 2004; that Defendant Atlas Tack Corporation has been remiss about responding to the Government's demand letter; that there is an immediate and urgent need to demolish buildings at the Atlas Tack property and to undertake the other activities outlined by the Government in order to prevent harm to human health and the environment; and that the proposed remedial action is irrelevant to the Court's decision on the Government's Motion. On each of these assertions, the Government is patently wrong. We will provide the facts that the Government has conveniently decided to ignore in order to provide this Court with a more comprehensive analysis of why the Government is suddenly seeking immediate access and why such access should not be granted.

## II.   Background

### A.   There is no Imminent Threat to Human Health and Welfare Justifying the Government's Proposed Action

While the Government now claims that the decision to seek immediate access is to address human health and environmental risks, the United States Environmental Protection Agency's ("EPA") own actions belie this very notion. EPA's decision to demand access and remediate the site now, on the eve of litigation, is based on political

1

pressure without any environmental or human health justification. For years, EPA Headquarters failed to fund the cleanup at the site. However, in May, local EPA managers were successful in shaking loose $1.8 million from the national Superfund, plus $180,000 in contribution from the Commonwealth of Massachusetts, to conduct activities set forth in the Government's demand letter. In fact, on May 21, 2004, at a press briefing by members of Congress and EPA officials on the steps of the New Bedford City Hall, it was announced that $1.8 million, plus $180,000 in contribution from the Commonwealth of Massachusetts, would be spent. See Affidavit of Donald W. Stever, Esq. ("Stever Aff."), Exh. 1 at 1-3. This decision to spend this exorbitant sum of money, which the United States will seek to recover from Atlas Tack, was never formally announced to Atlas Tack prior to the public announcement. The United States then issued a public notice that alleged that the "contaminated buildings are being demolished" at the Atlas Tack site and invited the public to an informational meeting on June 24, 2004 to discuss this planned action. See Stever Aff., Exh. 2 at 1. At the June 24, 2004 community meeting, EPA announced that it planned to begin demolition activities sometime in August 2004. See Stever Aff., Exh. 3 at 1; Exh. 4 at 2. It was in response to these various public statements that Defendants Atlas Tack Corporation and M. Leonard Lewis jointly filed a Motion for a Preliminary Injunction on July 20, 2004 (Civil Action No. 01-10501-WGY [lead case], No. 03-CV-11601-WGY [consolidated with lead case for discovery only]) in order to prevent the government from undertaking a costly and unnecessary action that would be premature and prejudicial, when there was no scientific justification for why these activities must be completed prior to completion of the Phase I and Phase II proceedings. Thus, the issue of access did not commence with the issuance

of the August 2, 2004 demand letter by EPA, but rather with the filing of the Defendants' Joint Motion for a Preliminary Injunction on July 20, 2004.

**B.  EPA's Actions Since the Filing of the Preliminary Injunction Motion Belie EPA's Claim that Immediate Access is Necessary**

While the Government now claims that the onset of winter weather requires immediate access and commencement of remedial activities, the Government's actions since the filing of the Joint Preliminary Injunction Motion belie this argument. The Government could have had the issue of access resolved in early August, instead the Government sought extension upon extension to respond to the Preliminary Injunction Motion. On or about July 23, 2004, Counsel for the Government contacted counsel for Atlas Tack indicating that the United States had no intention to immediately tear down the buildings and requested a briefing schedule that would enable the United States to avoid filing an immediate opposition to the Preliminary Injunction Motion. Atlas Tack negotiated in good faith with the United States in order to enable the United States to avoid filing an immediate opposition to the Preliminary Injunction Motion. On July 27, 2004, the First Stipulation on the briefing schedule was submitted to this Court. The First Stipulation, in fact, states "EPA has committed not to engage in demolition activities at the Atlas Tack Facility until this Court issues an Order granting EPA access to the Atlas Tack Facility. Atlas [Tack] therefore does not believe that it requires resolution of the [Preliminary Injunction] Motion before September 13, 2004, in order to protect its interests." If there was an immediate need to undertake the Government's activities now, as the Government claims, then one has to wonder why the Government, which actually drafted the Stipulation, would be requesting an extension on the briefing schedule and providing such assurances.

3

The First Stipulation envisioned that the United States would submit a letter requesting access from Atlas Tack, which the Government fully expected would be denied. The access demand letter was provided on August 2, 2004. The Government takes great pains to note that Atlas Tack did not provide a written response to the August 2nd letter denying access. However, the access demand letter specifically noted that "if we do not receive your [Atlas Tack's] signed access agreement on or before Friday, August 6, 2004, EPA will assume that you do not consent to this request for access." Thus, exercising the option provided by the demand letter, and rather than reiterating comments that had been previously provided in its Joint Motion of Preliminary Injunction as well as conserving Atlas Tack's limited financial resources, Atlas Tack denied access by its silence. After the issuance of this letter, <u>again at the request of the Government</u>, on or about August 9, 2004, the Atlas Tack Defendants agreed to an extension of the briefing schedule. A Second Stipulation was filed with this Court on August 10, 2004. Each Stipulation envisioned that the Government would file its Complaint in Aid of Access and a Motion for an Order In Aid of Immediate Access.

Rather than simply filing its Complaint and Motion, on August 18, 2004, to the surprise of the Atlas Tack, the United States issued an Administrative Order pursuant to 42 U.S.C.§ 9604(e)(5) directing compliance with an August 2nd access letter. Again, following the procedures set forth in the Order by EPA, on August 19, 2004, the Atlas Tack Defendants requested a conference call with the United States. Atlas Tack reiterated that its objections to the Administrative Order were set forth in detail in the Preliminary Injunction Motion.[1] As the Preliminary Injunction papers noted access to

---

[1] In its Motion, the Government notes that it will seek penalties from Atlas Tack in a subsequent hearing. During the call, counsels for Atlas Tack Corporation and M. Leonard Lewis requested the United States

4

change the status quo at the site Area prior to the commencement of Phase I and Phase II proceeding should be not granted because (1) it would cause irreparable harm, (2) it was not financially justified, and (3) it was not scientifically justified.

Quite simply, the irreparable harm would be the result of the loss of evidentiary information on production processes and waste handling practices at the site if the Government is permitted to go forward with its access and remedial action. The evidentiary importance of the buildings is confirmed by the United States itself. In fact, the attorneys for United States representing the Army Corps of Engineers requested access to the facility so that experts could garner evidence relevant to their defense against counterclaims. Moreover, Atlas Tack's experts have made numerous site inspections in order to rebut or support claims and counterclaims. The activities proposed by the Government are also not financially justified because after years when no monies were allocated to the cleanup of this site and after the application of political pressure, EPA seeks to spend as fast as it can, the allocated $1.8 million. Given that Congress has failed to reauthorize Superfund taxes, which has resulted in the depletion of the Superfund trust fund from approximately $1.5 billion in 1995 to less than $40 million

---

confirm that it would not seek monetary penalties on account of Atlas Tack Defendants' denial of access pending this Court's ruling on the pending Joint Motion for Preliminary Injunction (i.e., that United States would not seek penalties for the time period between (i) the date when the Atlas Tack Defendants agreed to the United States' request to delay the hearing date on Defendants' Joint Motion for Preliminary Injunction and (ii) the date of the Court's ruling on the Preliminary Injunction Motion). In other words, the United States requested that Defendants defer the time for ruling on the issue of site access, yet always intended to seek penalties for the time period engendered by Defendants' professional courtesy. This position is in contradiction to what had been agreed upon during negotiations over the Stipulations. If the Government had ever indicated to the Atlas Tack Defendants during its negotiations that it would continue to seek penalties during the extension of the briefing schedule, counsels for Atlas Tack Defendants would not have agreed to such terms. After a number of conference calls and exchanges of letters and emails when counsels for Atlas Tack Corporation and M. Leonard Lewis indicated that they would seek an emergency appeal to this Court for determination on penalties during this period, the Government agreed not to seek penalties from September 1 to September 23 in exchange for Defendants not filing their emergency appeal with the reservation of Defendants' right to contest any penalties that the Government may seek from August 2, 2004 to August 31, 2004 as well as no admission of the Government's right to seek such penalties. Moreover, counsel for Leonard Lewis asserted that because Mr. Lewis did not own the building at issue-- Atlas Tack does --Mr. Lewis, individually, was not the proper party to grant access.

5

in 2004, there is no reason to believe that EPA fully funded remediation of the site would commence. Thus, it is critically important that any scarce funds allocated to this site are spent in a manner that implements the most scientifically justifiable remediation. The proposed demolition of the building will cost EPA far in excess of what Atlas Tack believes it would cost if Atlas Tack were allowed to demolish the buildings on the site in a cost-effective manner by obtaining salvage value for certain components. In fact, Atlas Tack received an estimate that demolition of the buildings would cost $180,000--one tenth of EPA's proposed $1.8 million. Thus, in their effort to appease the public by vigorously pursuing immediate access, the Government is wasting the public's money.[2]

Finally, there is no scientific justification for EPA's contention that it requires "immediate access to the [Atlas Tack Property] to proceed with the remediation of contaminated soil and sludge within the Commercial Area of the Property." EPA's reasoning is that the "contamination from the soil and sludge in the Commercial Area leaches to the groundwater and surface water, and migrates to the Non-Commercial Areas of the Site." Plaintiff's Motion at 6-7. However, EPA has failed to recognize *what its own contractor noted*, that there is no hydrological connection between any groundwater underneath the Atlas Tack property and contamination in the marsh and beyond it into the surface water. See Stever Aff., Exh. 5 at 6. EPA's own Remedial Investigation (conducted by Roy C. Weston) as well as independent investigations by Atlas Tack's consultant, Rizzo Associates, that are part of EPA's administrative record, demonstrates that there is no contaminant plume resulting from leaching of hazardous

---

[2] The Government's continued attempts at access have resulted in much of Atlas Tack's available insurance funds to be spent on attorney's fees, rather than saved for remediation activities. Rather than wasting both the taxpayers' and Atlas Tack's money, the Government should conserve what little funds are available so as to ensure an efficient remediation of the site and to achieve a favorable outcome for the Fairhaven community.

6

contaminants from the Commercial Area. See Stever Aff., Exh. 5 at 6; Exh. 6 at ES-7, 6-17. Rather, the scientific data indicate that there is instead a correlation between the Boys Creek contamination on the site and contamination of Boys Creek upstream from the site because the groundwater and surface water quality data shows that the combination of heavy metals in Boys Creek is the same as in the surface water upstream from the site. See Stever Aff., Exh. 5 at 6. In other words, the contaminants and the levels of contaminants in the natural environment at the site are the same as those found in Fairhaven's storm water sewers, which dump urban runoff from the lawns and streets and parking lots of Fairhaven into the Boys' Creek marsh. Even if EPA undertakes the remedial activities identified in the ROD, it has not addressed significant sources of contamination such as the Town's stormwater runoff, which will cause continual contamination on the site in the future.

Thus, EPA's decision to seek access now is based on political pressure not due to concerns about human health or environmental risk and is not justified on either a financial level or scientific level.

### III.   ARGUMENT

**A.   EPA's Decision is Arbitrary and Capricious, And Therefore Access Should be Denied**

The Government would have this Court believe that its standard of review is limited. The Government's Motion notes: "In the circumstances before this Court, once the Court concludes that EPA has a reasonable belief that there has been a release or threat of release of hazardous substances, it need only confirm that EPA has selected a remedial action and that its request for access is a reasonable means of implementing that

7

selection." The Government further states that: "The appropriateness of the cleanup, itself, is not at issue in the access case."

The Seventh Circuit in <u>United States v. Tarkowski,</u> 248 F.3d 596 (7th Cir. 2001) specifically noted that the court would not issue an access order without examining the grounds for going on the property. Sections 104(e)(1), (3) and (4) of CERCLA, 42 U.S.C. §§9604(e)(1), (3), (4), authorize EPA to go upon the property to inspect or to obtain samples for testing or "to effectuate a response action", "if there is a reasonable basis to believe there may be a release or threat of release of hazardous substance or pollutant or contaminant." However, Section 104(e)(5)(B)(i) of CERCLA, 42 U.S.C. §9604(e)(5)(B)(i), provides that if consent to the entry is denied, the government may obtain a judicial order preventing interference with the entry "unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." In interpreting these provisions of CERCLA, the Court noted that since "the requirement of reasonable basis is easily satisfied", "this makes it all the more important to consider whether the agency's action is unreasonable (arbitrary and capricious)." <u>Tarkowski,</u> 248 F.3d at 599. "When an access order is sought, judicial jurisdiction clicks in; the arbitrary and capricious standard clicks in." <u>Id.</u> at 601. However, in order to conduct an arbitrary and capricious analysis, a court must consider "whether the measures proposed are a reasonable basis for authorizing what would otherwise be a trespass." <u>Id</u> at 602.

**1.    EPA's Decision to Seek Access is Arbitrary and Capricious Because It Was Not Based on a Threat to Human Health or Welfare, But Rather on Political Pressure**

As stated above, EPA's decision to seek access is arbitrary and capricious because it was based on political pressure and it was based on flawed analysis of scientific data.

8

As noted above, local EPA managers were successful in shaking loose $1.8 million from the national Superfund, plus $180,000 from the Commonwealth of Massachusetts, after years of no funding for this site, to conduct activities set forth in the Government's demand letter. Now, EPA is bound and determined to spend every cent as soon as possible. Given that these are scarce funds allocated to this site, the manner in which they are spent should be scientifically and financially justifiable. The proposed demolition of the building will cost EPA far in excess of what Atlas Tack believes it would cost if Atlas Tack were allowed to demolish the buildings on the site in a cost-effective manner by obtaining salvage value for certain components. Thus, in their effort to appease the public by vigorously pursuing immediate access, the Government is wasting the public's money. The lack of scientific justification is discussed in more detail below.

### 2. EPA's Decision to Seek Access is Arbitrary and Capricious Because It Was Based On Flawed Analysis of Scientific Data

EPA's decision to seek access is arbitrary and capricious because it was based on flawed analysis of scientific data. As noted in Plaintiff's Motion, a significant basis for conducting excavation of the Commercial Area is the alleged migration of contamination into the Non-Commercial Areas. However, as noted above, sampling during the Remedial Investigation and subsequent studies by EPA's consultants and by Atlas Tack's consultants indicate, *inter alia*, that there is in fact no contaminant plume resulting from leaching from the Commercial Areas; that the combination of heavy metals in Boys Creek is the same as in the surface water upstream from the site (and thus these contaminants are not unique to the site); and that a number of the constituents listed as

9

driving the risk for remediation were from sources other than the Atlas Tack. See Stever Aff., Exh. 5 at 5-13; Exh. 7 at 2-10.

Additionally, EPA made numerous errors in its analysis of the scientific data underlying the remedial action, which if access is granted would commence. The human health and ecological risk assessment that resulted in the proposed remedial action was fundamentally flawed. Because of errors made with respect to the form and toxicity and distribution in the environment of iron, arsenic, pesticides, cyanide, and polycyclic aromatic hydrocarbons ("PAHs"), EPA's remedial consultant calculated a risk factor for the Atlas Tack site that barely exceeded the trigger used by EPA to justify taking remedial action. These errors are set forth in Roy F. Weston's Updated Human Health Risk Assessment and Development of Risk-Based Cleanup Levels (April 1998) ("UHHRA") and Draft Final Feasibility Study (1998), and are repeated in the Record of Decision. See Stever Aff., Exh. 8 at 2-2, 2-34-2-36, 3-7-3-13; Exh. 9 at 2-28; Exh. 10 at 11-20. Furthermore, EPA attributed all of the contamination to Atlas Tack, while in fact the substances that EPA relied upon to present a sufficient risk to warrant taking remedial action, and incurring the costs it seeks to recover in this action, were not substances released by Atlas Tack Corporation, or were released in only confined areas on its own site, and have been shown not to be migrating into areas where people or organisms might be affected. Moreover, the EPA's entire remedial plan is fundamentally flawed because no matter what is done, the Town's stormwater runoff will continue to contaminate the site.

EPA was only able to cobble together a sufficient health and environmental risk to satisfy its own criteria for taking remedial action by relying on risks presented by chemical contaminants that cannot reasonably be linked to Atlas Tack operations. See

10

Stever Aff., Exh. 8 at 2-1—2-36. For example, to the extent there is any inorganic (bad) arsenic on the site, the source of that contamination was not the Atlas Tack facility. For years, the Town sprayed lead arsenate in an insoluble powder form onto trees in order to protect them from gypsy moths and elm leaf beetles. The lead arsenate powder would remain on the trees until a rainstorm removed it and would enter the site through the Town's storm water system. See Stever Aff., Exh.11 at 2; Exh. 12 at 1-2. There was also periodic spraying of pesticides of the hurricane dike by the Army Corps of Engineers or, on behalf of the Corps, by the Town, over a significant period of time. See Stever Aff., Exh. 13 at 1; Exh. 14 at 1. The Town, along with many others on the northeast coast, sprayed or arranged for the spraying of DDT, which degrades extremely slowly, to control mosquitoes in the 1940s, 1950s and 1960s in the salt marsh. See Stever Aff., Exh. 15; Exh. 16. The Town even encouraged its residents to spray DDT solution onto shrubs. See Stever Aff., Exh. 17 at 1.

Additionally, Atlas Tack's electroplating operations involved the use of simple cyanide salts, which is highly reactive and would oxidize quickly resulting in evaporation of most cyanide deposits in the acid neutralization pond; and any remaining cyanide would combine with other reactive metals to form a stable form of cyanide, that of metallic cyanide, which is not considered to be particularly hazardous. See Stever Aff., Exh. 18 at 233-234. EPA assumed that all of the cyanide in the environment was the toxic variety, and also assumed that all of the cyanide came from Atlas Tack. However, the Town was another source of cyanide—in particular, iron cyanide, a long-lived form of cyanide, which was for many years a standard anti-caking additive to road salt, and its presence is widespread in coastal marshes which receive urban stormwater runoff. Id. at 234.

Also, when trying to find enough risk to satisfy its criteria for remedial action, EPA did not properly analyze scientific data on the principal chemicals on which it premised its decision to take remedial action. For example, it is well recognized that marine ecosystems have naturally elevated arsenic levels, and that shellfish from marine systems all have elevated arsenic levels in the form of organic arsenic. See Stever Aff., Exh. 18 at 68-69; Exhs. 19 –22. The concentrations of arsenic at the Atlas Tack site are comparable to, and are not greater than, arsenic concentrations in other areas of coastal New England. See Stever Aff., Exh. 7 at 3, 6. Similarly, cyanide levels reported to be from soft shell clam tissue samples were erroneously reported by EPA's contractor, which further led to EPA's decision to take remedial action. If calculated in a proper way (a dry weight basis), the cyanide levels would be comparable to what is found in consumer meats and meat products. See Stever Aff., Exh. 7 at 6. Finally, with respect to PAHs, rather than addressing this very localized contamination through a limited and targeted soil remediation plan, EPA presented the site as contaminated with PAHs by focusing on the combined (indoor and outdoor) PAH level resulting in EPA's justification that a site-wide soil remediation plan was necessary.

Thus, this Court must deny the Government's Motion for Order in Aid of Immediate Access since EPA's decision to seek such access and remediation until the completion of Phase I and Phase II proceedings. EPA's decision to seek such access is based upon arbitrary and capricious decision-making. It is based on political pressure and a flawed analysis of scientific data. Thus, to allow EPA access now would result in the expenditure of funds that would not address contamination issues in a manner that would be protective of human health and the environment.

## IV.   CONCLUSION

For the reasons stated above, the Court should deny the Motion of the United States for an Order In Aid of Immediate Access and allow this issue to be resolved after the completion of Phase I and Phase II proceedings.

Dated: September 13, 2004

New York, NY

>                                          Defendant Atlas Tack Corporation
>                                          By its attorneys,
>
>                                          _____
>                                          Donald W. Stever
>                                          Julie E. Steiner
>                                          KIRKPATRICK & LOCKHART LLP
>                                          599 Lexington Avenue
>                                          New York, New York  10022
>                                          (212) 536-3900

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that on the 14th day of September, 2004, I served true and correct copies of the following documents by electronic mail and by first class mail to the individuals below: (a) Defendant Atlas Tack Corporation's Memorandum of Law in Opposition of the United States' Motion for an Order in Aid of Immediate Access; (b) Affidavit of Donald W. Stever, Esq.

      A CD-ROM containing all exhibits to the affidavit was also served by first class mail on the individuals listed below:

Steven O'Rourke
Environmental Enforcement Section
Environment and Natural Resources Division
Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
steve.o'rourke@usdoj.gov

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02110
george.henderson2@usdoj.gov

Donald G. Frankel
Trial Attorney
Environmental Enforcement Section
Environmental and Natural Resource Division
United States Department of Justice
One Gateway Center, Suite 616
Newton, MA 02458
donald.frankel@usdoj.gov

Joshua M. Levin
Trial Attorney
Environmental Defense Section
Environmental and Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
joshua.levin@usdoj.gov
*Attorneys for United States of America*

Robert Gilbert
Gilbert & Renton LLC
23 Main Street
Andover, MA 01810
rgilbert@gilbertandrenton.com
*Attorneys for M. Leonard Lewis*

Thomas P. Crotty
Blair S. Bailey
Perry, Hicks, Crotty, Deshaies
388 County Street
New Bedford, MA 02740
tomcrotty@perryhicks.net
blairbailey@perryhicks.net
*Attorneys for Town of Fairhaven*

_/s/ Kathryn Plunkett_
Kathryn Plunkett

2