# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 04-11880 WGY |
| | ) | |
| v. | ) | |
| | ) | |
| ATLAS TACK CORPORATION and | ) | |
| M. LEONARD LEWIS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | C.A. No. 03 CV 11601 WGY |
| Plaintiff and | ) | [Consolidated with case 01-10501 WGY |
| Counter-Defendant, | ) | for discovery only] |
| v. | ) | |
| | ) | |
| ATLAS TACK CORPORATION and | ) | |
| M. LEONARD LEWIS, | ) | |
| | ) | |
| Defendants and | ) | |
| Counter-Plaintiffs. | ) | |
| | ) | |
| ATLAS TACK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 01-10501-WGY |
| | ) | |
| THE TOWN OF FAIRHAVEN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## UNITED STATES' SUPPLEMENTAL BRIEF CONCERNING ITS MOTION FOR AN ORDER IN AID OF IMMEDIATE ACCESS

## <u>INTRODUCTION</u>

On Thursday, September 16, 2004, the Court held an in-court conference concerning the United States' August 16, 2004 Complaint and accompanying Motion for an Order in Aid of Immediate Access to property owned and/or controlled by the Defendants and the Defendants' Motion for a Preliminary Injunction. The Court indicated a preliminary view that the law favors a grant of the requested order for access and that the Court was not inclined to delay EPA's access to implement the remedy at the Site until the spring 2005. The Court, however, questioned whether it should decide a challenge to the remedy and the cost effectiveness of the remedy before deciding whether to grant the United States' motion for immediate access and deny the Defendants' motion for a preliminary injunction.

As explained below and previously in the United States' briefs, the Court should not delay granting the requested access order to allow consideration of those other issues at this time. A review of the remedy is improper and the "equities" favor granting the United States access to the Site and denying the Defendants' Motion for a Preliminary Injunction. Moreover, courts do not consider such issues in determining whether access should be granted to EPA to conduct a selected remedy at a site. Doing so would otherwise defeat the legislative mandate of CERCLA to promptly clean up Superfund sites. The remedy and cost issues will be heard in Phase II of the cost recovery litigation.

In arguing that EPA should not demolish certain buildings on the Site, Defendants have led the Court into mistakenly believing that the building demolition will cost $1.8 million. As discussed in the United States' opposition to the Preliminary Injunction and further below, most of the $1.8 million will be used for the other selected remedial activities in the Commercial Area.

In addition, EPA's March 2000 Record of Decision included an estimate for building demolition of $184,000, which is only $4,000 more than Defendants' estimate.[1]

The Court also asked for guidance on record review and questioned why the United States did not attempt to resolve the access issue on July 29, 2004, the date the Court scheduled an emergency hearing on the Defendants' motion for a preliminary injunction. The United States respectfully submits this supplemental brief in order to respond to the concerns raised by the Court.

## ARGUMENT

As the United States has demonstrated in its Memorandum in Support of its Motion for an Order in Aid of Immediate Access, in considering whether an order for access should issue when the owner or person controlling the property at issue denies access, the Court is required to enjoin any interference with EPA's entry to the property, under CERCLA section 104(e)(5)(B), 42 U.S.C. § 9604(e)(5)(B), if the Court finds that, (a) EPA has "a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant," and (b) EPA's demand for entry cannot be deemed "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." See United States v. Mountaineer Ref. Co., 886 F. Supp. 824, 828 (D. Wyo. 1995) (where EPA sought entry to property, "only the EPA's determination that there is a release or threatened release of hazardous substances . . . is subject to review under an arbitrary and capricious standard").

---

[1] The Court should note that the actual cost for demolition of course may differ from the estimate provided in the ROD. At this time, EPA and the Corps are negotiating with the remedial action contractor the terms of the contract, including costs.

In this case, EPA has more than a "reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant." EPA has documented evidence that there has been a release <u>and</u> a continuing threat of release of hazardous substances in the Commercial Area of the ATC Property. AR 0001-23. In fact, ATC has so admitted in its opposition to the United States' Motion for Partial Summary Judgment. <u>See</u> Atlas Tack's August 27, 2004 Opposition to Plaintiff's Motion for Partial Summary Judgment re: Liability of Atlas Tack Corporation, p. 12 ("Atlas Tack can not [sic] dispute the contention . . . that some "hazardous substances" were released to the environment over the years and that the residue of those releases exists in the soil, and in confined areas of groundwater on its property"). EPA's determination therefore cannot be questioned as to whether there is a "reasonable basis to believe there may be a release or threat of a release of a hazardous substance or pollutant or contaminant." Moreover, it is further supported by the listing of the Atlas Tack Corporation Superfund Site ("Site") in 1990 on CERCLA's National Priorities List ("NPL"), a list of sites across the country in most urgent need of governmental response, by the performance of Superfund-financed remedial actions. 42 U.S.C. § 9605(8)(B); 55 Fed. Reg. 6154 (Feb. 21, 1990). Defendants can no longer challenge the listing of the Site on the NPL.

In addition, in its Response to Defendants' Motion for a Preliminary Injunction, the United States established that Defendants may <u>only</u> challenge EPA-selected remedies as part of any affirmative defense to an EPA cost recovery claim. PI Response, at 7-11. This Court therefore should only address the Defendants' remedy challenges in Phase II of the cost recovery case, and then only by performing a review of the administrative record documents. The Court should not substitute its judgment as to an appropriate remedy for that of EPA, which is the

agency charged with remedy selection under CERCLA and the National Contingency Plan, and

has the expertise to make such technical and scientific decisions.

I.      Access Issues Stand Alone and Should Be Decided Prior to the Scheduled Trial for
        Recovery of EPA's Past Response Costs

On August 27, 2003, the United States filed a Complaint to recover costs EPA has

incurred at the Atlas Tack Corporation Superfund Site ("ATC Site" or "Site") for previously

performed response activities at the Site and a declaratory judgment of the Defendants' liability

for future costs.  Phase I of that case, regarding liability, has been set for trial this fall.  EPA

never contemplated or agreed to delay initiation of remedial activities at the Site until after trial.

Moreover, Defendants never expressed any such concern when they agreed to a litigation

schedule knowing that EPA could seek to initiate the remedial action at anytime.

This Court's decision in United States v. Charles George Trucking Co., Inc., 682 F.

Supp. 1260 (D. Mass. 1988), should control how the Court proceeds with respect to EPA's

motion for an order in aid of immediate access.  In that case, the United States filed a complaint

seeking reimbursement of costs incurred by EPA for performance of remedial activities and an

order for access to perform remedial activities.  In that case, Defendants argued that access

should be denied on several grounds, including that the remedy was not cost-effective.  In

granting the United States' motion for an order in aid of immediate access to perform the

selected remedy, the Court stated that the fortuity that cost recovery litigation and the request for

access would occur at the same time "cannot be used as a mechanism by which to undercut

Congress's clear intent in the 1986 amendments to CERCLA to preclude pre-enforcement

review of EPA remedies, and, thereby, expedite the cleanup of hazardous wastes."  Id. at 1272

(citing Dickerson v. Administrator, EPA, 834 F.2d 974, 978 (11th Cir. 1987) ("'to delay remedial

action until the liability situation is unscrambled would be inconsistent with the statutory plan to promptly eliminate the sources of danger to health and environment'"").

Defendants here argue that the demolition of certain buildings will be "costly and unnecessary," which terms are far from a meritorious defense to cost recovery, when EPA seeks those costs. The statutory standard for cost recovery is straightforward. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides that "notwithstanding any other provision or rule of law," the United States is entitled to recover "all costs of removal or remedial action . . . not inconsistent with the National Contingency Plan ("NCP")." Any claim that the response costs incurred by the United States for the implementation of a remedial action is "excessive," "unreasonable," or "not cost-effective" does not allege inconsistency with the NCP, and therefore, would not provide a defense to a cost recovery action under CERCLA section 107(a). United States v. Kramer, 757 F. Supp. 397, 436 (D.N.J. 1991).

The NCP, however, requires EPA to select the final remedial action for a site through a process that identifies various remedial alternatives and evaluates them by reference to a number of criteria, including overall costs. 42 U.S.C. § 9621(b)(1); 40 C.F.R. §§ 300.430(e) and (f). United States v. Kramer, 913 F. Supp. 848, 865 (D.N.J. 1995). In this consideration of feasible alternatives, the cost of installing or implementing the remedial action must be considered, including operation and maintenance costs. 40 C.F.R. § 300.430(e)(7)(iii) and 40 C.F.R. § 300.430(f)(1)(ii)(D). "Costs that are grossly excessive compared to the overall effectiveness of alternatives may be considered as one of several factors used to eliminate alternatives." 40 C.F.R. § 300.430(e)(7)(iii). The NCP does not contain any provisions limiting the cost of implementing a remedy that has been selected in compliance with the NCP requirements, or

dictate the selection of the <u>most</u> cost-effective remedy.  All that is required is that the agency

consider cost estimates during the remedy selection phase, and select a remedy that "the agency

determines" at that time to be cost-effective.  Nothing in the NCP addresses the actual cost of

implementing the remedy action.  42 U.S.C. § 9621(b)(1); 42 C.F.R. Part 300; <u>United States v.</u>

<u>Kramer</u>, 757 F. Supp. at 436; <u>United States v. Kramer</u>, 913 F. Supp. at 866 .

     Pursuant to requirements set forth in the NCP, EPA performed an exhaustive cost-

effectiveness evaluation, in addition to an evaluation of the protectiveness of alternative

remedies, during its remedy selection phase.  AR 3117 (Table ES-5 in Executive Summary

listing 17 proposed remedial alternatives and total cost for each); AR 3230-3365 (An evaluation

of each potential remedial option in detail, including cost); AR 3727-3850 (Tables summarizing

the costs associated with the various remedial options); AR 3549-3590 (Appendix G, with line

item breakdown of costs estimates for each portion of the remedial options).  Thus, Defendants

must show "that EPA acted arbitrarily and capriciously in failing to <u>consider</u> cost, or in <u>selecting</u>

a remedial alternative that is not cost-effective."  <u>United States v. Royal Hardage</u>, 982 F.2d 1436,

1443 (10th Cir. 1992) (emphasis added).

     The necessity for the building demolition and the estimated cost therefor are described

and set forth in the Record of Decision and further explained in the Administrative Order for

access.  Any assertion that the United States intends to use approximately $1.8 million only to

take down buildings is wrong.  Most of the approximately $1.8 million will be used in the

Commercial Area to perform additional sampling to better define the remediation areas, excavate

of soil and sludge that exceed the surface and subsurface cleanup levels, and dispose of

contaminated soil and sludge at appropriately licensed facilities.

Defendants' litigation tactics are a misguided and inappropriate attempt to obtain what they were unable to obtain through EPA's remedy selection process, which process is governed by CERCLA and the NCP. Prior to selecting the remedy for the site, EPA evaluated the practicability of 17 potential response actions (during the Feasibility Study), AR 3079-3850, 5807-6451, and settled on one combination as the proposed remedial action plan ("PRAP") for the Site. AR 3867-3881. The public, including the Defendants, submitted over 49 separate sets of comments to the PRAP between 1998 and 2000, some proposing altogether different response actions. Certified Index to the Administrative Record, Item Nos. 48-68, 70-78, 80-83, 85, 87, 90-100, 129. EPA considered and responded to the comments, modified its PRAP and issued a formal Record of Decision in 2000. AR 1114-1342. The Defendants, displeased that EPA did not select their proposed remedy, belatedly chose to file a preliminary injunction arguing erroneously that EPA's remedy would result in Government waste with respect to costs allegedly related to the demolition of buildings.

Defendants also argue that the remedy for the Site is scientifically unjustified. In response, the Court asked whether it was required to hear a challenge to the remedy prior to deciding whether access should be granted. The answer is no. As this Court noted in United States v. Charles George Trucking:

> PRPs, seeking to limit their liability for hazardous waste cleanup, can be expected to make every effort to diminish the overall clean-up bill before it ultimately comes due. If every cost-reduction suit were heard when it was brought, however, cleanup of hazardous waste sites could be deferred for years while courts attempted to determine who would be responsible for which portion of the cleanup, and to decide what actions should be required of EPA under CERCLA to ensure the least expensive cleanup consistent with environmental standards. In order to avoid the conflict between the PRPs' interests in inexpensive cleanup and the

> public's interest in safe and rapid remedies, CERCLA empowers
> EPA to clean up waste sites itself, and to collect from PRPs after
> the cleanup has been completed.

Id., at 1272-73 (quoting Cabot Corp. v. United States EPA, 677 F. Supp. 823, 828 (E.D. Pa.

1988)); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir.

1986) (to read the exceptions to CERCLA section 113(h) broadly would defeat the legislative

mandate of CERCLA to expeditiously clean up Superfund sites, and to replenish the Superfund);

United States v. M. Genzale Plating, Inc., 723 F. Supp. 877, 885 (E.D.NY 1989) (court does not

have jurisdiction to review costs and the defendants' possible responsibility for such costs of a

proposed RI/FS until EPA seeks recovery of those costs).

Instead, Defendants' arguments concerning the remedial activities that they challenge

may only be addressed in Phase II of the cost recovery litigation.  See PI Response at 7-11.  If

the Court determines, after a review of the administrative record supporting the selected remedial

activities, that EPA's remedy is inconsistent with the NCP, and therefore arbitrary and

capricious, EPA simply cannot collect the costs associated with that portion of the remedy

determined to be arbitrary and capricious.[2]  Id.  Regardless, as hereinafter explained in Section II

below, the Court cannot modify EPA's selected remedy following that review, much less

substitute Defendants' preferred remedy.  Moreover, as the United States demonstrated in its PI

opposition the Court lacks subject matter jurisdiction to enjoin the performance of a remedial

action based on allegations that such performance may result in a waste of superfund monies or

---

[2]  42 U.S.C. § 9613(j)(3); See In re Bell Petroleum Servs., Inc., 3 F. 3d 889, 905-907 (5th Cir.
1993) (finding a portion of the remedy selected to be arbitrary and capricious and thus
inconsistent with the NCP); Lone Pine Steering Comm. v. EPA, 777 F.2d 882, 887 (3rd Cir.
1985); see also United States v. Kramer, 757 F. Supp. 397, 436 (D.N.J. 1991); O'Neill v. Picillo,
682 F. Supp. 706, 728-29 (D.R.I. 1988), aff'd, 883 F.2d 176 (1st Cir. 1989).

the remedial action is scientifically unnecessary or unjustified.  Perhaps, that is why Defendants

do not and cannot cite any precedent for their extreme propositions and requested relief.

II.    Judicial Review of EPA's Remedy is Limited to the Administrative Record of the
       Selected Remedy In Phase II of the Trial in This Action

The Court may only entertain the Defendants' challenges to the appropriateness of EPA's

remedy for the Site during Phase II of the trial in this action as part of their respective cost

defenses.  See Amended Answers, Defense No. 13.; United States v. NL Indus., Inc., 936 F.

Supp. 545, 551-52 (S.D. Ill. 1996); United States v. Charles George Trucking, at 1272-73;

accord North Shore Gas Co. v. EPA, 930 F.2d 1239, 1245 (7th Cir. 1991).  At that time, this

Court's review "shall be limited to the administrative record," 42 U.S.C. § 9613(j)(1), and the

Court "shall uphold the [EPA's] decision in selecting the response action unless the objecting

party can demonstrate, on the administrative record, that the decision was arbitrary and

capricious or otherwise not in accordance with law."  42 U.S.C. § 9613(j)(2). See United States

v. Northeastern Pharm. & Chem. Co., 810 F.2d 726, 748 (8th Cir. 1986); Sierra Club v. Marsh,

976 F.2d 763, 769 (1st Cir. 1992) (challenge to adequacy of Environmental Impact Statement

reviewed on administrative record); NL Industries, 936 F. Supp at 551-52;  United States v. Iron

Mountain Mines, 987 F. Supp. 1250, 1254 (E.D. Cal. 1997); United State v. Mexico Feed &

Seed Co., 729 F. Supp. 1250, 1256 (E.D. Mo. 1990); United States v. Seymour Recycling Corp.,

679 F. Supp. 859, 861 (S.D. Ind. 1987).

Under this standard, the Site remedy may be found to be arbitrary and capricious "only if

[EPA] relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." United States v. Burlington Northern R.R., 200 F.3d 679, 689 (10th Cir. 1999) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983)); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989) ("[w]hen specialists express conflicting views, an agency must have the discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive."); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).

When reviewing the record in this matter, the Court should proceed as the United States Supreme Court and the Administrative Procedure Act ("APA") instruct that the federal courts proceed when applying the arbitrary and capricious standard: "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; Federal Power Comm'n v. Transcon. Gas Pipe Line Corp., 423 U.S. 326, 331 (1976) ("[O]rdinarily review of administrative decisions is to be confined to 'consideration of the decision of the agency . . . and of the evidence on which it was based'. . . .' [T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'") (emphasis added) (citing Camp v. Pitts, 411 U.S. 138, 142)); Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985).

As a practical matter, this means that the Court is to evaluate EPA's chosen response action under the standard of review articulated in 42 U.S.C. § 9613(j) based solely upon the administrative record before EPA. Evidentiary hearings are entirely inappropriate, as they create new records made initially before the reviewing court. The proper scope of review is the body of administrative record documents that were before, or were created by, the EPA

contemporaneously with its decision making, and that now have been designated and placed
before this Court.

Extra-record affidavits submitted in support of litigation filings (unless expressly made
part of the administrative record by EPA as materials considered in its decision making process),
expert reports and other affidavits or extra-record materials prepared by litigation experts, and
testimony adduced in evidentiary hearings or at trial, are not part of the administrative record.
See Overton Park, 401 U.S. at 419-21.  The Defendants therefore may not proffer such materials
for use by this Court when reviewing the administrative record, as they cannot establish any of
the four grounds on which an administrative record may be found inadequate to support judicial
review: (1) judicial review is frustrated because the record fails to explain the agency's action,
Camp v. Pitts, 411 U.S. at 142-43 (1973); (2) the record is incomplete, Texas Steel Co. v.
Donovan, 93 F.R.D. 619, 621 (N.D. Tex. 1982); (3) the agency failed to consider all relevant
factors, Florida Power & Light Co., 470 U.S. at 744; or (4) there is a strong showing the agency
engaged in improper behavior or acted in bad faith, Overton Park, 401 U.S. at 420.  Moreover,
even if the Defendants could establish that the current record is inadequate, this Court could not
review EPA's selected Site remedy based upon any of the Defendants' extra-record materials or
arguments.  Instead, the Court first would have to remand the remedy to EPA to supplement the
record, and then perform its review based upon the supplemented record returned by EPA.[3]

---

[3]  Florida Power, 470 U.S. at 743-44 (If the record . . .  does not support the agency action, . . .
the proper course . . . is to remand to the agency for additional investigation or explanation);
Camp v. Pitts, 411 U.S. at 143; C.K. v. N.J. Dept. of Health and Human Serv., 92 F.3d 171, 182
(3rd Cir. 1996); Horizons Int'l v. Baldridge, 811 F.2d 154, 162 (3d Cir. 1987); Society Hill
Towers Owners' Ass'n v. Rendell, 20 F. Supp.2d 855, 862 (E.D. Pa. 1998) aff'd, 210 F.3d 168
(3d Cir. 2000).  Even as part of a remand, the Court "may not . . . dictat[e] . . . the methods,
                                                                        (continued...)

The administrative record in this matter clearly documents the factual and scientific basis for the remedy EPA selected for the Site, as well as EPA's thought process at each stage of the decision-making process.  The administrative record submitted to the Court includes the sampling data, scientific investigations and reports, and public comments and responses thereto on which the selected remedy was based, as well as the administrative Record of Decision ("ROD") articulating the selected remedy and rationale therefor.  Furthermore, it contains the Administrative Order describing the ROD actions EPA intends to take through the end of Phase II of the trial in this matter, as well as the internal memorandum explaining the rationale for the Access Order and other post-ROD materials upon which EPA based its related decisions.  The United States therefore believes that this Court's review of the administrative record, and more particularly the portions thereof listed in the attachment to this brief, establish that EPA's selection of the remedy for the Site and Administrative Order demanding access are not arbitrary and capricious, and that the Court should enforce the Administrative Order directing the Defendants to provide access to the Property.

III.    EPA's Request for an Extension of Time to Respond to Defendants' Preliminary Injunction Motion Should not be Considered Evidence of the Lack of a Need to Respond to the Release or Threat of Release of Hazardous Substances at the Site

This Court asked whether there was an emergency prompting the United States' Motion for Access and, if so, why the United States did not seek to resolve the access question when the Court initially scheduled an emergency hearing for July 29, 2004 to hear the preliminary injunction motion.  First, it was not until June 16, 2004, that EPA received the full estimated

---

[3](...continued)
procedures, and time dimension of the needed inquiry."  Federal Power Comm'n v. Transcon. Pipeline Co., 423 U.S. at 333-34.

amount (approximately $1.8 million) it needed to implement the selected remedial activities in the Commercial Area of the Site.[4]  Thus, on June 16, 2004, EPA then knew the remedy could financially go forward this year.  In early July 2004, EPA began the process of establishing an interagency agreement ("IAG") for the Site with its contractor, the U.S. Army Corps of Engineers ("Corps").[5]  This process typically takes 4-6 weeks from the date of request to the final obligation of funding and acceptance by the Corps.  Through the IAG, the amount of $1,810,166 was obligated to the Corps on August 24, 2004, for the performance of the remedial action in the Commercial Area.[6]

On July 20, 2004, the Defendants filed their motion for a preliminary injunction.  This was the first time that EPA learned of Defendants' opposition to access to its Property for the implementation of the remedy.  Upon learning of the filing, the Court scheduled an emergency hearing on the requested PI for July 29, 2004.  Preparation and filing prior to July 29 of a brief would have provided the United States with less than the full amount of time to evaluate and submit an opposition.  Rather than preparing a response, the parties agreed to a briefing schedule, which enabled the parties to fully address all issues in advance of a hearing.  Clearly,

---

[4]  On April 8, 2004, pursuant to a consent decree among the United States, the Commonwealth of Massachusetts, and the Hathaway-Braley Wharf Company (a potentially responsible party at the Site), EPA received $510,166 for use at the Site.  On May 4, 2004, the Commonwealth of Massachusetts contributed $750,000, as its contribution of the costs of the remedial action as required by CERCLA section 104(c)(3)(C), 42 U.S.C. § 9604(c)(3)(C), to be used for the first stage of the remedial action, which amount EPA received on May 4, 2004.  Finally, on June 16, 2004, EPA received from EPA Headquarters, an additional sum of $550,000.

[5]  For Superfund-lead remedies greater than $5 million, EPA uses the Corps as a construction manager through an IAG.

[6]  The Corps cannot award the contract, however, until access to the Site has been secured.

none of the parties contemplated that the extension of time for the U.S. to oppose the PI would prejudice its opposition or ability to gain access to the Site.  The parties agreed upon a briefing schedule that would result in a hearing on September 23, 2004, for the Court to hear arguments on both Defendants' PI and the United States' anticipated motion for an order in aid of immediate access.[7]  In establishing that briefing schedule, EPA was assured by the Corps that the briefing schedule would not be prejudicial, as an order on or about September 23 would still allow sufficient time to perform the selected initial activities in the Commercial Area prior to the onset of winter weather conditions.

Pursuant to CERCLA section 104(e)(5)(A), EPA requested access through both a Letter Request for Access to Property dated August 2, 2004 and an Administrative Order issued on August 18, 2004[8], to conduct selected remedial activities in the Commercial Area of the ATC property.  On both attempts, EPA was denied access.  EPA's decision to issue the Administrative Order in the circumstances of this case is consistent with this Court's ruling in United States v. Charles George Trucking Co., Inc., et.al., 682 F. Supp. 1260 (D. Mass. 1988):  "Moreover, it may be inappropriate for the EPA to proceed directly to district court to enforce an entry request in cases where the administrative setting could provide 'notice and opportunity for consultation,' § 9604(e)(5)(A), to affected property owners, and where an administrative order would be helpful in clarifying exactly what entry would entail."  Id. at 1269-70.  Notwithstanding the

---

[7]  The Defendants and the United States were informed by the Court's clerk that September 23, 2004, was likely to be the first motions day available on the Court's calendar.

[8] EPA issued an Administrative Order with the hope of giving the Defendants another opportunity to confer about the selected remedial activities and resolve the access issue short of litigation.  The Administrative Order further clarified what the $1.8 million would be used for and why the demolition was necessary.

above, the fact remains that EPA has a reasonable basis to believe that there has been a release

and that there continues to be a threat of release of hazardous substances into the environment

that requires a remedial action and has determined that a remedial action is necessary at the Site.

There is no reason to further delay performance of the remedy now that EPA has obtained the

funding needed to implement the remedy.

In their September 13, 2004 response to the United States' motion for access, Defendants

assert that there is no "immediate" or "imminent" threat to human health and welfare to justify

the performance of the remedy prior to the onset of winter conditions.  The United States is not

required to make the more stringent finding of an "imminent and substantial endangerment to the

public health or welfare or the environment because of the actual or threatened release of a

hazardous substance," as is required for an action under CERCLA section 106.  This action is

not an action under Section 106.  Under CERCLA section 104(e), in this action, EPA is simply

required to show that it has a "reasonable basis to believe there may be a release or threat of

release of a hazardous substance or pollutant or contaminant" to gain access to a site – a fairly

undemanding requirement that is readily met here.

<u>**CONCLUSION**</u>

For the foregoing reasons, and as provided in Section 104(e)(5)(B) of CERCLA,

the United States respectfully requests that this Court grant the United States' motion for an

order in aid of access and deny the Defendants joint motion for a preliminary injunction.

Respectfully submitted,

THOMAS L. SANSONETTI
Assistant Attorney General

- 16 -

/s/ Alfred S. Irving Jr.
ALFRED S. IRVING, JR.
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C.  20044-7611
(202) 305-8307

HEATHER E. GANGE
U.S. Department of Justice
Environment and Natural Resources
  Division
Environmental Defense Section
P.O. Box 23986
Washington, D.C.  20026-3986
Telephone:  (202) 514-4206

MICHAEL J. SULLIVAN
United States Attorney
District of Massachusetts

GEORGE B. HENDERSON, II
Assistant United States Attorney
District of Massachusetts
One Courthouse Way
Suite 9200
Boston, Massachusetts 02110
(617) 748 - 3272

OF COUNSEL:

MAN CHAK NG
Senior Enforcement Counsel
Office of Environmental Stewardship
U.S. Environmental Protection Agency
One Congress Street, Suite 1100, Mail Code SES
Boston, MA 02114-2023